White v. Hitachi Good morning. My colleague points out that we have in this case a number of confidentiality markings throughout. That's correct. Including a marking of confidentiality on certain terms in this agreement. To what extent are we constrained in our discussions by these confidentiality markings? I would prefer to be careful, but I don't see any reason for the purposes of my argument to take any special precautions. Well, we have, for example, section 5.1 of the contract, which is key here, is labeled in your brief as being confidential, even though it was disclosed in the district court opinion to the public. It was disclosed in the district court opinion, and I think this argument will be fine. Language in the MOUs, for example. I can't speak to the MOUs, since I don't represent the parties to that transaction. But I was wondering whether we could, because whether we're talking in court today or whether we're writing an opinion or however we dispose of the case, it would seem to me that the thing that you most, would most want to keep private were the numbers. That's correct. Whatever the running royalty was, this sort of thing, and the amount of money that someone paid for a percentage of ownership in the, in the, in the NV entity. And if we can talk freely about what the contract terms were, it certainly would make the argument a lot easier. I agree. As to section 5.1 of the white IBM license, I absolutely agree. I am authorized to speak on the Hitachi documents, but I don't have a problem with the discussions in the court today, and I agree on the numbers. Mr. Reines? Yes. Thank you, Your Honor. For the appellees, we have no concerns about anything except the numbers. So I think we can proceed with all of the provisions of the various contracts. All right. So if, if we, are we in agreement then, then we can discuss anything in the record except for the numbers? Yes. All right. Well, on that. Thank you. On that understanding, let's proceed. May it please the court, the core of this case is James White's special relationship with IBM. IBM was his first employer after he earned his bachelor's degree, and at IBM he competed for an IBM internal contest where IBM paid for him to go to Stanford and earn his doctorate. Why, why is that the core and not the language of the agreement? I mean, you know, I, I guess I appreciate that you want to emphasize that, but it seems to me that we're, we've got an agreement that the parties entered into, and it's hard to rewrite an agreement based on a representation with respect to relationships, right? Well, the, it is the core because first, it is recited in the agreement at the appendix at A2770. Yeah, but it's not a term of the agreement, correct? No, but it recites the special relationship, it recites that there are special terms in the agreement, and then the agreement as a whole includes section 5.1. But you're not suggesting that that special relationship and this discussion and the agreement compels our construing a term other than it would otherwise be construed because of that, right? No. The terms should be construed in accordance with California contract law as California would. As they would, whether or not there was an agreement or not, which is going back to my earlier point, why that is the core of this question, whether, rather than the terms of the agreement. It is the core of this question for two reasons. First, it explains in part the anti-transfer provision. It explains the special reason to keep the contract with IBM. Right, but I mean, your, the heavy weight of your argument is that it was White's intention was to confer benefits on IBM and nobody else because of what IBM did for him. In part, yes. Right. Now, if you look at paragraphs 1.6 and 2.1 in the contract that deals with subsidiaries and what a subsidiary is, your client who wanted to make certain that only IBM got the benefit of this sweet deal, IBM could have set up a sub, 51% owned by it, 49% owned by Hitachi, right? Yes. Could have done it and could have, you know, run the, all of the benefits of the, could have sub-licensed that entity. Yes, it could have. Right? And 49% of the goodies that can, IBM could have shoved its entire business into that sub, its hard drive business. And Hitachi, if it wanted to, could have shoved its hard drive business into that, not for stock ownership, but for income coming out of it. Yes, it could have. And so, the very contract that you tell me should have never, in no way, benefited anybody other than IBM, left a gaping hole in it through the definition of subsidiary. Except that is not what happened. No, but I'm just saying, you want us to interpret the contract, or at least to get a feel for the environment around the contract? This is a white IBM deal, solo, but it's not. Because 49% of the goodies could have been pumped out through a sub of the license to somebody who was already in the hard drive business. Except that Control could never have left IBM. They don't care about Control. But it's very clear that 51% would have to stay with IBM. To get to the, sort of cut to the chase, because I got my head around the case and trying to figure out where you are. Mariana Envy was a successor to IBM's hard drive business, right? It may be argued. We would say that... I'm trying to do the first transfer and the second transfer, because the way the district court looked at this, and they said, look, this is in the plain meaning, Mariana was a successor to the hard drive business. Mariana was already sub-licensed, you know, before it got in the business, and under whites, and it wasn't previously in the hard drive business. So the initial transfer looks to be quite okay under section 5.1. I would disagree that it is quite okay. If you atomize a transaction, it is how you just described it. However, our position is you cannot atomize a transaction. IBM and Hitachi intended one entire transaction. It intended that those assets, including the white license, be transferred from IBM to Hitachi. You're going to pierce the corporate form then? No, we are not piercing the corporate veil. We have never advocated that. Not the veil, but the form of the transaction. We are looking at the substance of the transaction. What IBM and Hitachi stated was the substance of their transaction, which in the cases that we have cited on our other theory under Trubowitz, the Sexton case says in California law, you must look at the substance. Was IBM contractually obligated to let Hitachi invest in the NV? I would say yes. Well, show me a document, were they contractually obligated? I know what the MOUs say in terms of how we're setting this up, and the idea is that down the line Hitachi's going to control the NV, okay? But was IBM contractually obligated to follow through on that? On the MOU or on other documents? On the MOU... No, just cite me a document that says, what I'm trying to do is to isolate the transaction, so you have your initial transaction that I just described where Mariana NV is set up and they transfer, they sub-license it, right? That's correct. Right. Let's assume that IBM and Hitachi had a falling out at that point in time. What would have stopped IBM from walking away from the deal? I believe the framework agreement, Your Honor. The framework agreement. The framework agreement described these series of transactions. IBM... Framework agreement in the record? Yes, it is. Where? A-2-3-1-1-3. That's a contract? Yes, it is. It's between IBM and Hitachi Limited. Okay. I'll look at that. So the court below seemed to think that you were complaining about two possible transactions, both the initial transaction, which I described, which is before Hitachi puts any money into the NV. We are complaining of that transaction as it is a part of the entirety, the continuum of the IBM-Hitachi transaction. If you were to atomize that transaction, it may be allowable under the white IBM license. However, it is not possible to atomize. You must look at the continuum that from the beginning, from the memorandum of understanding through the framework agreement... Are we certain that no one who was already in the hard drive business would ever get any benefit of the license, of the white license? Yes. The point was that it was not to be transferred to another company. They're not to get the benefits of that. Well, no. We just won't get benefits. So we can't atomize because White had made darn sure that the benefits of his invention, of his license, would never go to someone who was already in the business unless they had been licensed, right? You cannot atomize because... No, but I'm trying to get... When I restarted the argument, we proved, I believe, that under sections 1.6 and 2.1, IBM could share the benefits of the white license with anybody who was already in the business if they wanted to. They could not share control. They could share the benefits. They could share the benefits. Yes. In accordance to those sections, IBM could move that license. Why doesn't that color your argument as to why you say you can't atomize the transaction with Hitachi? Because the point of the transaction, from the memorandum of understanding through the framework agreement, was a transfer of assets where Hitachi, and the framework agreement states this, would have complete total control over the assets. It was their intent that Hitachi have all control, control the board of directors, control the officers, control 99, more than 99 percent of the voting stock. Wait, wait, wait, wait. Like at page 18 of your brief, you at one point referred to the NV as a wholly owned sub of Hitachi. It became a wholly owned subsidiary of Hitachi, yes, Hitachi Limited. The record shows the highest percentage that they ever got, like 73, 74 percent. No, your honor. It was 70 percent initially. Over a couple of years, it declined, became 100 percent owned by Hitachi Limited. But where's that in the record? That is in the framework agreement and in the subsidiary documents of the transaction. But from day one, from January one. I think it's important, at least under the California law cases, it may be important as to whether the Hitachi actually owns the, IBM is entirely out of the deal. At this time, and for several years, IBM has been 100 percent out. Well, at this time is irrelevant. We're talking about what happened as of the time that this case was being tried. As of the time this case was being tried, IBM had a declining ownership. However, the documents. It declined to 17 percent or something like that. It declined. I don't know exactly what it was when the patent expired, but it declined to zero. But from the initiation of the transaction, Hitachi had 100 percent control over the company and had all benefits. It controlled. It didn't have all the benefits. I mean, if IBM is getting 30 percent of the, it's a 30 percent owner, it's getting something for its 30 percent. The agreement was that IBM was to receive no benefits and that Hitachi was to control more than 99 percent of the voting interest. It was to control the directors and the officers. From the- You can, you know, lots of corporations, you can have 99 percent of the voting interest is over here, like the Ford family and, you know, these tiered stocks, right? Washington Post Company. This wasn't tiered. There was some tiering. There were voting trusts. But the document stated that it was the intent that Hitachi, from the initiation of the transaction, would have 100 percent control. That is in the framework agreement, primarily the framework agreement. You need Trubowitz and SQL, right? For one of our theories, we have two theories. We have the theory that the transaction as a whole was an impermissible attempt to transfer the white IBM license. We also have the Trubowitz theory, a series of cases, which the sale of stock of Mariana from IBM to Hitachi Limited was an impermissible transfer under Trubowitz and its progeny, including SQL Solutions. All right. Would you like to reserve the balance of your time? Yes, I would, Your Honor. All right. Very good. Mr. Reines? Thank you, Your Honor. Good morning. I'd like to start with where my adversary left off, which is this concept of 100 percent control of the company through stockholding. California law is clear in case after case, going back decades, that when you are a stockholder of a company, that does not mean you own individually each of the assets, such that a change in  So even if it were 100 percent here, if it were 100 percent that had gone to Hitachi, you still would maintain that there was no transfer of the asset? Yes. I mean, those were the facts in Farmland, Surbay, Superblade, all those cases. The argument that was made was— But not Trubowitz and SQL. Well, in those cases, those cases have an even bigger difference. In those cases, the corporate form changed. So in other words, it's not as though there's a company, and then there's a transaction among shareholders. One shareholder buys, one shareholder sells, which could happen with IBM, interestingly. In those cases— SQL is talking about when there's a change in control. A merger. Change in legal corporate form. You'll see that language in every single case, is that it's a change in the legal form. And that's one of the things in the briefing that gets a little muddy, which is there's a difference between a change in ownership, that is typical sales of stock, versus change in the legal form, which is a merger. Most of the California cases actually relate to corporations either being disbanded or being created, and assets of the stockholding group going into the company or coming back to the stockholder. How do we know what the or otherwise transferable language in the contract means? How do we know what it means? Because— I mean, in terms of what it means, it's— What it means means. I mean, we didn't get into this part of the argument with Mr. Heathie, but that's a big part of his briefing argument, is that otherwise transferable deals with what happened here when Atashi bought in. So, you say in your brief, otherwise transferable is just lawyer language, I'm reading from page 44, that's used to ensure that a transferee of the license, you know, wouldn't be captured, you know, if what you didn't— if it wasn't formally an assignment, but maybe it looked like one. Right. And my point in asking the question is— And that's what they say happened here. Understood. And my point is that transfer can't mean that we're emasculating the rule in these non— in these anti-assignment provisions, that change in stock ownership doesn't result in a change of an assignment. You take— Well, that's where your other side's arguing SQL in particular. Right. But I'm citing— SQL's a merger. SQL's got a stock purchase in it. SQL's a merger. Well, they purchased all the stock to affect the merger in SCAT. And they changed the— And you're saying that's different than here, because they purchased all the stock, but it wasn't to— they didn't affect a merger. They didn't affect a merger. There wasn't a change in legal corporate form. But if you look at case after case, and the most relevant cases on the facts are Institute of Pasteur, Baxter, Review Directories, as well. For sure. I mean, that's how all this case came up. That's what the district court was relying on. And then the second motion for reconsideration, the two California cases pop up. And the question is whether those two California cases run counter to Pasteur. Right. Those are excellent. First of all, I'd say that in going back to even farmland, the California courts recognize that federal case law is persuasive because of the federal court experience in the Patton area. So specifically— Let me ask you a question about SQL. I mean, you're a member in good standing of the California Bar, if I'm not mistaken. So, unlike the judge who said he didn't understand California law, has SQL, to your knowledge, been cited in any subsequent cases, has it been followed? I mean, it's a non-presidential decision from twenty years ago and I don't believe— That's not my question. Has it been followed? I'm not aware of— A very highly distinguished judge wrote that opinion. I'm not aware of any case that has anything to do with this matter before us to which that was cited. That dealt with SQL? Right. But there's just— The short of the matter is that SQL, the part of SQL upon which your adversary relies quite heavily is dictum. I mean, a total dictum because the case was decided on the basis of federal copyright law preempting state law. So, whatever you said about state law was like worth about like what a law reviewer would do. I mean, that's true, but I really would emphasize that when they recite the true which rule— I agree with you that the way this is set up, there's all these federal cases from around the country that all hold clearly that assignment or transfer—getting back to finish the other point, Your Honor—that or transfer was not defeated by a stock sale and they are on a nearly identical facts with competitors and all the same concerns. So, you're saying that whatever transfer might mean, Hitachi was never transferred any rights. If anything, it acquired stock and that's it. It's acquired stock through a legal form that owns assets. Every time that there's a change in stock ownership, there isn't a transfer of each individual asset for purposes of anti-assignment provisions. That would throw the law in total chaos. If you apply that principle, there's about 10 cases in these briefs that would be turned upside down. Well, yes. I mean, your adversary is not disagreeing with that. He says, I got two—California law governs here. You agree with that? Yes, Your Honor. Let's assume there was a case in California law that says when there's a change in control of a corporation, change in control of a corporation, we'll treat it as though there was a change in ownership or control of the underlying license. Okay. You'd be in real trouble if there was a case that said that, right? Yes. We'd probably all be now. You'd be finished. I'd be in trouble as a lawyer for Hitachi in this case and as a Californian citizen. I understand that. I understand that. But give your adversary his due. He's saying to you, that's what Trubowich and FQL hope. Right. And so when you look at Trubowich, Trubowich actually cuts in favor of California law being even more protective of the alienability of property. The Trubowich rule is where you change the legal form, okay, not just the stock sale. So let's say— I know. We'll look through it to see what went on, right? We'll look through it for two reasons. We'll look through it first because we want people to be able to assign agreements. So the fact that someone moved property from a corporation to a shareholder, from a shareholder to a corporation, or two shareholders changed it or whatever else. But if the legal form changes, you're not necessarily barred even if there's a flat anti-assignment provision, even if it says you cannot assign or transfer. If there's a change in legal form, we still may save you. We still may let you assign. We may let you do an absolute assignment if we look at the situation and we see no harm, no foul. That's the situation. So Trubowich tells you that this case is more compelling to permit assignment than all the other federal cases. That's what I said earlier. SQL is the one where Judge Patel gets a hold of Trubowich and inverts the logic and says, hey, I'm going to turn this around in a situation where there's been a change in legal form. And they're going to buy it, either by merger. They also refer to a stock purchase, she does, in her opinion. And so it's SQL is what's going to be stuck in your craw. Well, I mean, SQL, the thing about SQL is right up front, she cites Trubowich for the point about the change in legal form and then states it at least additional times as it goes through. Right. I mean, I don't disagree with you. I mean, the other side can hear it. I don't think Trubowich helps them. I think SQL does, depending on how you choose to read it. But that's why I asked you whether we're sitting here, like the judge down in Nashville, or we're ever trying to decide what California law is. I don't know that we would want to put much reliance on a non-precedential opinion where the part of the opinion that's being cited in these authorities is all dictated. Understood. And that's fair. I would, I mean, I've said it before, and I don't want to get repetitive, but right at the outset, what Judge Patel says is California courts have consistently recognized that an assignment or transfer of rights does occur through a change in the legal form of ownership. It doesn't say change in the ownership. And one of the issues, and I'm concerned that through some of the briefing with ellipses and so forth, that there's a loss of that importance of the legal form change. Trubowich is clear. There is no case, zero, where there's just been a stock change where Trubowich has been applied, where there's been a stock sale and someone's applied Trubowich. None. They've all been a change in legal form. The other provision of California law- Except SQL. No, in SQL, it's a merger. She says it over and over again, because it's hard for pagination on these non-precs, but on page four, she says, cases have held that a transfer of rights is no less a transfer because it occurs by operation of law in a merger. Then at the bottom, the concluding paragraph, did occur when DNN merged. And if you look back, when they talk about Sexton, which is another case they rely on, this is on the prior page in the middle, rights occurred because of a change in legal form. No one has applied Trubowich to just the sale of a shareholder, and no one has used it in the way that's being attempted here. And another important policy of California, from the Supreme Court on down there, is disfavor of forfeiture, disfavor of forfeiture. So they're into the teeth of strong policies in California, which make the law even less transferability than the First Circuit, the Seventh Circuit, the Second Circuit, that's it, Pasteur, Baxter, Carte Blanche, review directories. So if they're really hinging everything on Trubowich- You don't disagree with Mr. White and his attorneys that what ultimately happened here is something Mr. White didn't want to have happen. That is to say, to have someone who was already in the hard drive business enjoy the benefits of the IBM White license. It's just they didn't protect themselves. Well, leaving aside that their licensing operation, which was substantial and had numerous sophisticated people involved in drafting an agreement, so I think they probably knew what they were doing, but let's assume they didn't, which is what you're positing. Let's assume they didn't understand the meaning, not understanding all these established principles of law, and the fact that they had multiple partners at a major firm doing this, with an incredible pile of resources behind it. Assume they didn't, why? Right? What they wanted, and this was one of the points in the interchange in the opening argument was, well, they wanted IBM to retain control, right? We heard that numerous times. The critical piece of this was they wanted IBM to retain control. Not true. The concept of the agreement was IBM could, and probably was planning to, spin its business off, okay? The agreement clearly contemplates no control for IBM, just like setting a bird free, that if you give it to, put it in a subsidiary with the business, it goes free. That was what was probably expected more than even contemplated as a possibility. That's what they did. There's stock ownership by Hitachi. So a company that happened to be in the business elsewhere, with its own business, owned this. If they cared, and there's numerous of these decisions that say, if you really want to regulate the alienability of a patent license in an intricate way, in terms of what people downstream can do, you need to be really careful about it. Well, they attempted to be careful. They said, well, you can assign it, and you can set it free, but only to somebody that either has a license or was not previously in that business. Right. And that's fine, but what they should have- So they had some concern. They did have some concern. I think they were contemplating a spin off. I think IBM said, we need to spin this off. But the last thing they wanted is to spin it off to somebody who was already in the business. I think the last thing they wanted was the license to go to blast a large business elsewhere. I don't think they cared that the license protected the IBM business. They wanted to make certain that the sweetheart, the benefits of the license inured IBM and IBM only. That has to be what they were thinking about. They don't want it to go to somebody else who's in the hard drive business. I mean, if you get down to economics, obviously, it was going to inure to IBM, because when they say that we got one way we treat, we treat IBM one way, we treat everybody else in hard drive different. But if everybody was going to agree there was going to be this spin off company, if the idea was that spin off company for the life of the agreement was going to be bound to certain particulars in terms of who could own it, it should have had a change of control provision. Or a right of refusal, some form of- There's so many things that the handbooks on patent licensing tell you you can do. It is not like they didn't have sophisticated counsel that knew what they were doing. There is no change of control agreement. And there was no- I'm still hung up on what otherwise transferable means and whether that phrase isn't ambiguous. I don't want to give an all-encompassing answer of what it always means. I mean, with assignments, we know we talk about in the standing area, all essential rights of virtual assignment. There's so many meanings it could have. It could also mean change in possession. But it doesn't mean stock ownership change of the company. That's because you say so. I mean, I don't know which book in your law firm you cite for authority for that. But the argument is that your adversary is making is that that other or otherwise transferable has embedded in it a change in control limitation. Right. And what I would say is that means the Baxter case, the review directory cases, the Serbi case- They say it does in California because of the cases they rely on. That transfer takes on this new meaning. I understand the transfer argument and the Trubowitz argument to be completely independent. I don't see that they're mutually reinforcing for all the reasons that I've given you. I think what they really want to do is they want to pierce the corporate veil and they don't want to have to put their evidence forward that they're doing it. Well, the district court judge did not interpret or otherwise transferable. Right. I mean, I- It didn't apply here. We didn't interpret the clause. I mean, interpret it in the sense of some kind of Talmudic deconstruction. No. In terms of applying it the way a large body of law has in the identical context. He said that's not going to mean that we now reach through to the shareholders and ignore the corporate form because there's so many cases that would be different. It can't be that relieves you of your obligation to show, to pierce the corporate veil. I think we all agree that you'd have to pierce the corporate veil if transfer wasn't there. Right. So now transfer comes here and it frees you from- You have to appreciate this in the backset of what this is all about. It's about California law and you take the Trubowitz, the base case that starts this off. This is a Roger Traynor opinion from 1946. You know- A pro-assignment case. Long, long time ago. Right. And it's a theory of trying to do good in California, produce just results. That's what drives Trubowitz. That's what's driving Trubowitz and pro-assignment and absolutely pro-assignment. That we in California have an idea. If you want to constrain the way property transfers, you better do it clearly. And even there- But not patent licensing. Well, I mean, but I don't see why that one source of property is treated differently than another. And in farmland, the Supreme Court, another Roger Traynor case, in farmland, they made clear, look, if a company was selling the stock, no one would ever argue that that's an inappropriate assignment of the company because of the bona fides of the company. Mr. Reines, I think we have your argument. Thank you very much. Well, thank you, Your Honor. I appreciate it. All right. Got a few minutes for rebuttal. Any final thoughts? Just a few final thoughts, Your Honor. First, under California contract law, there is no lawyer language in the contract. All terms must be interpreted. All terms must be given effect. In the case of In re Barnison, the California Court of Appeals interpreted the word transfer. It followed Black's Law Dictionary. And it looked at the definition, which said change in control. We've heard quite a bit about farmland irrigation. There's one very important point on farmland irrigation. There was no anti-transfer provision in the contract at issue in farmland irrigation. Council relies on many cases that do not include anti-transfer provisions. Where there is no anti-transfer provision, California will not insert one. But where there is an anti-transfer provision, California requires that it be interpreted and that it be given effect. It also requires, through the Trubowitz cases, that where there is a change in the legal form of ownership, which Judge Patel in SQL Solutions says includes the sale of stock. And she outright said sale of stock. If Trubowitz had never happened and SQL had never happened, right, you wouldn't have a case, would you? We would still have a case, Your Honor. We would have a case that the entirety of the transaction, from beginning to end, was an impermissible attempt to transfer. The framework agreement, which I've referenced, and it's in the appendix at A3128, Roman 2.2.2 states, to the fullest extent permittable under applicable law, on or after the closing, Hitachi shall have all rights with respect to the management of Mariana. The cover page of the framework agreement says, this is in the record at A3113, capital B, the party's desire for IBM to transfer its hard disk drive business to a group of newly formed entities, to be controlled by Hitachi from and after the closing. And Hitachi is a defined term. And there's a somewhere business to be controlled, right? Yes. And there are other provisions. Somewhere in the license, there's a provision that prohibits someone else from control. In the license, the white IBM license, Your Honor? Yeah. Is that the license you're asking? Yes. Where in that license is the prohibition on the control? The anti-transfer provision, Your Honor. The anti-transfer provision. 5.1. 5.1. 5.1 doesn't say anything about control. It says otherwise transferable. Your Honor, if Dr. White had written a whole bunch of specifics, every specific he could think of on how corporations might reorganize themselves, and then Hitachi found a different way to do it, we would be told that Dr. White could have written that specific one. What he did was he wrote a specific prohibition, no assignment, and then he wrote a generic, or otherwise transferable. And California law requires that that term be given effect. We know it doesn't mean assignment. It must mean something else. We know California courts have interpreted it broadly. We know they follow Black's Law Dictionary. It says it means change in control, change of possession, or change in control. And we know that Hitachi Limited could not take this license directly from IBM. Hitachi Limited did not fit the exceptions. It was already in the business. It was not licensed. Thank you. All right. Thank you very much. Thank both counsel. The case is submitted. Concludes our session.